UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GAIL JOHNSON, STUART HEBB, ) <br> RICHARD HYDE, SANDY TARR, ) <br> VICTORIA MELE, BEKKI SCHENKER, ) <br> PATRICK KENNEDY, NICK HARVEY, ) <br> and SHAWN McKENNA, ) <br> (Class Representatives), et al. ) <br> *Plaintiffs* ) <br> ) <br> v. ) <br> ) <br> The Narragansett Electric Company ) <br> d/b/a National Grid, ) <br> National Grid LNG LLC and ) <br> Algonquin Gas Transmission LLC ) <br> *Defendants* ) | C.A. No.: 1:19-CV-00643 |

## SECOND AMENDED CLASS ACTION COMPLAINT
### (INDIVIDUALS)

Now come the above Plaintiffs who are the representative class members and allege and state the following cause of action against Defendants: The Narragansett Electric Company d/b/a National Grid ("NG"); National Grid LNG LLC ("NG LNG") and Algonquin Gas Transmission LLC, ("AGT"), jointly and severally, alleging upon information and belief as follows.

## JURISDICTION

Federal Jurisdiction is conferred under the Class Action Fairness Act of 2005 28 U.S.C. S. 1441 (b) et seq. and Supplemental Jurisdiction to adjudicate pendent State claims under 28 US Code s. 1367.

## INTRODUCTION

1.    This is an action by Plaintiffs who were damaged by the Aquidneck Island Natural Gas Service Interruption of January 21, 2019. "Newport Gas Crisis". The Plaintiffs' causes of action arise from the Defendants: (a) State law negligence claims resulting in the interruption of the distribution of natural gas in the State of Rhode Island and Massachusetts; (b) Rhode Island State law breach of contract claims (c) Rhode Island State law Strict liability claims

(d) Rhode Island state law public nuisance claims and (e) Federal claims of gross negligence.

2.    Commencing on January 21, 2019, Aquidneck Island, Rhode Island was subjected to a natural gas outage of historic proportions (hereinafter "Newport Gas Crisis"). The young, the old, the infirmed, whole families and businesses have been impacted. Many of the town of Middletown and City of Newport's residents were forced to relocate, incur costs and otherwise suffer in the midst of a New England winter without heating and cooking gas. Businesses lost daily revenue, suffered property damage, spoilage and other losses and incurred, in some instances, damages from bursting water pipes, increased electric bills and other collateral effects.

3.    Plaintiff's allege strict liability, gross negligence, breach of contract and public nuisance due to the Defendants' failure to analyze, invest, and maintain the gas lines and infrastructure relied upon to supply and distribute natural gas to Aquidneck Island which caused the Newport Gas Crisis. The Plaintiff's anticipate their further investigation and discovery will reveal other failures, actions, and inactions on the part of the Defendants.

## PARTIES

### Plaintiffs

4.    That the Plaintiff, Gail Johnson, is a resident of the State of Rhode Island, residing at 24 Mary Street, Newport, Rhode Island 02840.

5.    That the Plaintiff, Stuart Hebb, is a resident of the State of Rhode Island, residing at 4 Faxon Green, Newport, Rhode Island 02840.

6.    That the Plaintiff, Richard Hyde, is a resident of the State of Rhode Island, residing at 31 Coddington Wharf, Unit 5, including all of the members of the Coddington Wharf association that resided at Coddington Wharf during the outage in Newport, Rhode Island 02840.

7.    That the Plaintiff, Sandy Tarr, is a resident of Chicago, Illinois with a local address of 17 John Street, Newport, Rhode Island 02840.

8.    That the Plaintiff, Victoria Mele, is a resident of the State of Rhode Island, residing at 42 & 44 Ledge Road, Newport, Rhode Island 02840.

9.    That the Plaintiff, Bekki Schenker, is a resident of the State of Rhode Island, residing at 30 Third Street, Newport, Rhode Island 02840.

10.   That the Plaintiff, Patrick Kennedy, is a resident of the State of Rhode Island, residing at 1 Dean Street, Newport, Rhode Island 02840.

-2-

11.   That the Plaintiff, Mick Harvey, is a resident of the State of Rhode Island, residing at 1 Dean Street, Newport, Rhode Island 02840.

12.   That the Plaintiff, Shawn McKenna, is a resident of the State of Rhode Island, residing at 33 Third Street, Newport, Rhode Island 02840.

**Defendants**

13.   That the Defendant, The Narragansett Electric Company d/b/a National Grid ("NG") is a Rhode Island Corporation with a principal place of business located at 280 Melrose Street, Providence, Rhode Island 02903.

14.   That the Defendant, National Grid LNG LLC ("NG LNG") is a Rhode Island Limited Liability Company with a principal office located at 280 Melrose Street, Providence, Rhode Island and an affiliate/subsidiary of Narragansett Electric Company d/b/a National Grid that operates a liquid natural gas storage facility in Providence Rhode Island. [1]

15.   The Defendant, Algonquin Gas Transmission LLC ("AGT") is a Delaware Corporation located at 5400 Westheimer Court, Houston, Texas 77056, registered as a Massachusetts Foreign Corporation doing business at 1284 Soldiers Field Road, Boston, Massachusetts, 02110, that maintains and operates natural gas transmission lines and is a 1,100 miles (1,800 km) long pipeline system which delivers natural gas to New England.

16.   The Defendants are jointly and severally liable for each other's negligence, misconduct, and wrongdoing as alleged herein.

---

[1]

The Department of Transportation ("DOT") sets safety standards for onshore LNG facilities, which have been adopted by the RI Public Utility commission . The DOT's authority originally stemmed from the Natural Gas Pipeline Safety Act of 1968 (P.L. 90-481) and the Hazardous Liquids Pipeline Safety Act of 1979 (P.L. 96-129). These acts were subsequently combined and re-codified as the Pipeline Safety Act of 1994 (P.L. 102-508). The acts were further amended by the Pipeline Safety Improvement Act of 2002 (P.L. 107-355) and the Pipeline Safety Improvement Act of 2006 (P.L. 109-468). Under the resulting statutory scheme, DOT is charged with issuing minimum safety standards for the siting, design, construction, and operation of LNG facilities.  It does not approve or deny specific siting proposals, because that authority is vested with FERC. DOT's implementing regulations for the Pipeline Safety Act, as amended, are in 49 C.F.R.§§ 190-199. Safety standards, for LNG facilities are in 49 C.F.R. § 193 and are overseen by the Department's Office of Pipeline Safety (OPS) within the Pipeline and Hazardous Materials Safety Administration (PHMSA).CRS-14. The Natural Gas Act (NGA) of June 21, 1938, ch. 556, 52 Stat. 812 (codified as amended at15 U.S.C. §§ 717 et seq.); the Department of Energy Organization Act of 1977 (P.L. 95-91)transferred to the NGA authority to approve siting, construction and operation of onshore LNG facilities to the Secretary of Energy (§ 301b).. The DOT regulations address operations (§§ 193.2501-2521),maintenance (§§ 193.2601-2639), employee qualification (§§ 193.2701-2719), and security (§§ 193.2901-2917).

17.     At all material times hereto, the Defendants were the affiliates, subsidiaries, principals, agents, employees, servants, and joint venturers of each other, and in doing the things alleged in this Complaint, were acting within the course and scope of their authority and relationship as affiliates, principals, agents, employees, servants and joint venturers with the permission, knowledge, and consent of each other.

## **BACKGROUND**

18.     The Defendants store, supply and/or distribute natural gas to Aquidneck Island and or various residences located on Aquidneck Island, in the State of Rhode Island, which include the Towns of Portsmouth and Middletown and the City of Newport.

19.     The Defendant, Algonquin Gas Transmission LLC. ("AGT"), an affiliate of Enbridge Inc., a multi national  Canadian pipeline owner,  manages a 1,140 mile gas transmission and pipeline system that  supplies major markets including Boston, Providence, Aquidneck Island, Hartford, and Cape Cod. AGT transmits natural gas from the southwest United States to the northeast via a series of compression stations and substations, referred to as Meter and Regulator stations ("M&R"), also referred to as "take stations". There are over 100 M&R's on the entire AGT system that supply distribution companies and power plants. The relevant M&R's involved in the interruption of natural gas to Aquidneck Island on January 21st 2019 are  located in Weymouth and Mendon Massachusetts, and in Portsmouth Rhode Island.

20.     From the Weymouth Massachusetts, M&R, the AGT gas transmission pipelines deliver natural gas to Aquidneck Island and other locations via a series of pipelines, that branch off into subsystems known as "laterals". The lateral at issue in this case is the G-System, that is fed from interconnecting gas pipelines that extend from an M&R in both Weymouth and at Mendon Massachusetts (just North of Woonsocket, Rhode Island), that traverses, via a series of pipeline subsystems into Bristol County, Massachusetts, through Attleboro and Taunton, extending into Tiverton Rhode Island,  where it crosses Mt. Hope Bay, with a termination in Aquidneck Island at the Portsmouth, Rhode Island M&R. The Portsmouth M&R is at the tail end of the  AGT G-System.(See below). AGT is regulated by the United States Department of Transportation, Department of Transportation Pipeline and Hazardous Materials Safety Administration CFR Title 49(b)§ Chapter 1 Subchapter D-Pipeline Safety Sections 186, et seq. ("PHMSA"), who, in the case at bar, conducted an investigation into the outage.





21.     At the Portsmouth M&R, the Defendant, Narragansett Electric Company d/b/a National Grid, NG is the local distribution company that assumes control of the natural gas and distributes the gas through its wholly owned and operated natural gas distribution system on Aquidneck Island that is regulated by the State of Rhode Island through the Rhode Island Division of Public Utilities and Carriers. ("PUD")[2]

22.     On Monday, January 21, 2019, ("NG") shut down the Portsmouth Rhode Island M&R due to inadequate gas system pressure that resulted in 7,455 customers in the communities of Newport, Portsmouth, and Middletown, Rhode Island (NG's Newport system), to lose gas service and heat. The impacts of the outage caused Rhode Island Governor Gina Raimondo to declare a state of emergency in Newport County and activate the National Guard to assist the customers without gas service.

23.     During periods of high demand, particularly in colder weather, it is sometimes necessary to supplement the natural gas supplied by the defendant AGT to Aquidneck Island and other

---

[2]

Narragansett Electric, (NG) is the sole local gas distribution system that is connected to the AGT "G System" transmission lines at ten (10) meter stations (M&R's) located throughout Rhode Island, including the meter station located in Portsmouth. These stations, (also called "take stations" or "city gates") have two purposes: measurement of gas quantity, and pressure control. The transmission company (AGT) measures the amount of gas flowing into each station. NG reduces the pressure of the gas from the transmission lines to match the pressure of its own distribution system on Aquidneck Island. The gas pressure is controlled by regulators, a special type of valve. The regulators can reduce the gas pressure. If the gas pressure rises or lowers above set limits, NG regulators can shut off the gas flow entirely. On January 21, 2019, the minimum pressure set at the Portsmouth M&R was 100 psi.

locations by vaporizing[3] liquid natural gas ("LNG") stored in NG's affiliate, the defendant, Providence NG LNG plant and send it via pipeline to the Portsmouth M&R.

24.    In the summer of 2018, the RI PUD highlighted concerns about gas supply to Aquidneck Island as part of a Data Request (DR) sent to National Grid (NG) on a proposed Navy Combined Heating and Power ("CHP") project that would require an immense supply of natural gas. In written Data Request responses, National Grid inaccurately stated to the commission that there was sufficient natural gas supply to Aquidneck Island until winter 2022-2023(Docket 4755 DR response 10-25.) In a correction to their initial statement, National Grid later stated that gas supply to Aquidneck Island would be fully subscribed in winter 2018-2019 (Docket 4934 DR response 3-5.) However, an ominous subsequent Gas Cost recovery filing by NG (Docket 4963, DR response 2-4) showed that gas supply to National Grid's Portsmouth (M&R) gate station was over-subscribed by approximately 15%.

25.    Prophetically, a cold front moved into Rhode Island late on Sunday, January 20, 2019, and temperatures dropped from 27 °F to 3 °F by 6:00 AM on January 21st. Due to the cold temperatures, in the early morning hours of January 21st, there was a call for additional natural gas supply, reducing pressure in its system. To maintain pressure, NG contacted its affiliate NG LNG in Providence to commence vaporization of its LNG to its gaseous state to maintain pressure and supplement the supply of natural gas to Aquidneck Island via its pipelines.

26.    NG LNG commenced vaporization. However at 3:45 AM, there was an interruption in the power supply to National Grid's LNG plant in Providence that triggered an automatic emergency shut down (ESD) of the power plant resulting in multiple equipment failures and limited vaporization capabilities of their LNG until 9:00 AM. NG LNG's sudden shutdown had an immediate and severe impact on the inlet pressure at the Portsmouth M&R.[4] that was requesting additional gas supply.

27.    Because of the shut down, NG LNG was unable to vaporize and supply additional needed natural gas to the Portsmouth M&R and the source of additional gas supply shifted from NG LNG back to the Algonquin G-System. This caused an increased draw of gas into Providence area, including Aquidneck Island, that greatly exceeded the maximum contracted rates of delivery into NG's gas distribution system for several hours. In turn, pressure began to drop at the tail end of the AGT "G system", Like most large gas transmission systems, AGT has

---

[3]

The liquid natural gas(LNG)is heated causing it to be vaporized into its gaseous state allowing it to be transported via interstate pipe lines from Providence to Aquidneck Island.

[4]

Liquid Natural Gas must be heated via vaporization equipment to transfer it from its liquid state to a gaseous state, before it can be distributed to its customers. That function was performed at the Providence LNG station.

Case 1:19-cv-00643-JJM-LDA   Document 13   Filed 01/13/20   Page 8 of 33 PageID #: 473

flexibility as to how it can operate under various conditions while meeting contractual requirements with NG for pressure delivery and daily/hourly gas nominations to its local distribution companies, including NG. However, when operating near capacity, as here, the flexibility of the system becomes limited and is increasingly more sensitive to overtakes[5] and response to the shutdown of the NG LNG plant as occurred on January 21, 2019.

28.   Under a mutual assistance agreement, NG contacted AGT to increase its supply of natural gas . However, in breach of its agreement with AGT, NG had already exceeded the amount of gas it had contracted for (overtakes) for transportation to customers through the AGT G-System, including the supply to NG's local gas distribution network on Aquidneck Island.[6]

---

[5]

An "overtake' is a request for the supply of gas that exceeds the maximum daily flow and/or hourly flow of gas contracted between Narragansett Electric and AGT.

[6]

The amount of gas delivered to Algonquin's customers is based on contracts with those customers. Algonquin's customers, including NG and other local gas utilities, participate in a daily process to request, or nominate, in advance the amount of natural gas that they expect will be needed to serve their customers. Algonquin then facilitates the transportation of those natural gas supplies to support the customers' requests for the subsequent gas delivery day. Depending on which contracts the customers have nominated service from, a maximum hourly flow rate entitlement can be established for each customer for that gas delivery day. Some customers may also have the contractual right to adjust the rates at which natural gas is taken throughout the gas day to reflect changes in demand on their systems. However, even during those hours of increased takes, every customer is subject to a contractual maximum hourly flow rate limit for that gas delivery day.

Hourly takes on the Algonquin System were exceptionally high on January 21, 2019. These high takes occurred between the hours of 5 am and 11 am, with the highest takes occurring between 6 am and 9 am.

On the G-System, total actual hourly takes on January 21, 2019 significantly exceeded NG nominations beginning at 4:30 am, and continuing until 10:30 am.

For Algonquin's ten M&R delivery points on the G-System in Rhode Island specifically, total actual hourly takes on the morning of January 21, 2019, significantly exceeded maximum hourly limits based on the scheduled quantities requested by NG and the associated hourly entitlements of those scheduled quantities. For the six hours beginning at approximately 5:00 am, actual hourly takes at those ten delivery points on the G-System in Rhode Island averaged more than 33% above maximum hourly limits based on the scheduled quantities requested by NG and the associated hourly entitlements of those scheduled quantities. Those actual hourly takes reached as high as approximately 54% above the maximum hourly limits for the hour beginning at 7:00 am. Actual hourly takes at Providence area meters significantly exceeded nominations beginning at approximately 3:45 am and continuing until 11:30 am.

Nonetheless, in response to the dropping system pressures, AGT attempted to bring on several of AGT's compressor stations, to supply additional gas, including one located in Burrillville, RI at 4:47 AM, that also supplied the G-System. The compressor unit could not be remotely brought online, and AGT dispatched a technician to resolve the issue in the field.[7]

29.   At 6:21 AM, AGT also attempted to increase gas supply to NG by raising the flow rate of gas from AGT's Weymouth M&R. However, due to a meter configuration error by the AGT technicians in the fall of 2018, rather than increasing the flow rates, the flow rate decreased and therefore was unable to increase the desperately needed gas to the G-System supplying Aquidneck Island.

30.   At 8:45 AM, AGT Gas Control contacted NG LNG to notify them of the meter issue and first learned, five hours after NG LNG's shut down, that there were unspecified problems at NG LNG.

31.   At 10:06 AM, NG began receiving no gas calls from Aquidneck Island residents and businesses. Around 10:30 AM NG began mobilizing portable trucks to ship LNG to

---

The sustained increase in NG's hourly takes of natural gas from the Algonquin G-System, both overall and in Rhode Island specifically, over an extended period of time caused a significant decrease in gas available to the G-System. NG's inability to use their LNG supplies in the Providence area during this time also caused NG to take increased volumes of natural gas from Algonquin in the Providence area. The material increase in takes from the G-system coincided with the time frame in which NG experienced their NG LNG facility shutdown.

Following this significant increase in demand, AGT's Houston Gas Control located in Houston, TX (HGC) adjusted the volume of gas flowing from Maritimes & Northeast Pipeline and Northeast Gateway LNG ships through the Weymouth M&R station into the Algonquin system. Approximately three hours after the significant increase in the hourly rate of gas taken in Rhode Island, Algonquin experienced an equipment malfunction at Weymouth, which temporarily restricted available natural gas supplies flowing through Weymouth to the east end of the Algonquin System. Specifically, when HGC initiated a flow setpoint increase at Weymouth at 7:20 am and a secondary meter run (Meter Run # 2) began to open, issues at Weymouth prevented the full flow increase into the Algonquin system.

After receiving notification from HGC at 7:41 am a Technician initially worked with HGC to attempt to resolve the situation remotely. When that was not successful, he left for Weymouth, arriving on site at 9:10 am. He started manual control of the control valve at 9:20am and reestablished stable flow at 10:29 am. An issue with the Remote Terminal Unit Program for Meter Run # 2 was corrected and the station was placed back in normal Auto Control at 11 :55 am Eastern.

7

One of the most important components of the natural gas transport system is the compressor station. These stations usually located about every 40-70 miles along the pipeline perform the essential task of compressing natural gas as it travels through pipelines. It is this compression which allows the gas to continue flowing through the pipe and eventually to its final destination for distribution to refineries and other end users.

supplement natural gas supply to the Portsmouth M&R. Thereafter the no gas calls continued through the day reaching over 1,200.[8]

_____

8

**Jan. 21, 2019**

• **Cold weather blankets the Midwest and Northeast resulting in large customer gas usage through large area and takes significantly in excess to the volume of gas nominated.**

• **12:14 AM – At AGT's request, DOMAC LNG increases send out to 3,000 MMBtu/hr.**

• **12:00 AM-1:00 AM – NG LNG vaporized 2,400 MMBtu @ 177 psig. Vaporizers 1 and 2 operational.**

• **1:00 AM-2:00 AM – AGT's packing cycle for January 21. AGT considered the line pack to be reasonable considering customer hourly takes, eastern supply profile, and horsepower availability.**

• **1:00 AM-2:00 AM – NG LNG vaporized 2,600 MMBtu @ 177 psig.**

• **2:00 AM – NG's Providence Area M&R takes exceeded the amount of natural gas allocated. This sub-system is normally supplied by AGT M&Rs and is near the head of the G-System. NG's Providence LNG Plant provides natural gas during times of peak usage.**

• **2:00 AM-3:00 AM – NG LNG vaporized 2,300 MMBtu @ 174 psig.**

• **3:00 AM-3:45 AM – NG LNG vaporized 1,880 MMBtu @ 172 psig.**

• **3:30 AM-9:30 AM – Demand on AGT G-System significantly exceeds nominations.**

• **3:45 AM – <u>NG Providence LNG plant experienced an automatic shutdown. A frozen suction valve that feeds both boil off gas (BOG) compressors freezes and ceases to send vaporized LNG into the Narragansett system. NG's non-ratable hourly takes jumped dramatically exceeding the amount of natural gas nominated. Pressure begins dropping at the Portsmouth M&R.</u>**

• **3:45 AM-5:00 AM – NG LNG - No vaporization, pressure is 100 psig.**

• **4:50 AM – NG LNG restarts Compressor 1.**

• **5:00 AM-6:00 AM – NG LNG vaporizes 200 MMBtu. Technician and plant supervisor arrive to assist with troubleshooting.**

• **6:00 AM-7:00 AM – NG LNG – no vaporization.**

• **6:15 AM – AGT requests DOMAC to increase flowrate to 7,000 MMBtu/hr.**

• **6:21 AM – Enbridge changes the meter set point at the Weymouth M&R to increase the supply of natural gas into the AGT system from 500,000 Dth/d to 700,000 Dth/d. Due to an incorrect K factor programmed into the meter's RTU, flow is reduced to 150,000 Dth/d and the station outlet pressure starts dropping from approximately 850 psig to less than 400 psig at 8:14 AM. Weymouth is about 40 miles upstream from the lateral to G-System.**

• **7:00 AM-8:00 AM – NG Providence NG LNG Plant restarted but continues to experience issues with two of their three vaporizers; virtually no natural gas vaporized between 4:00 AM and 8:00 AM. NG LNG Unable to start either compressor.**

• **7:26 AM – NG receives a low-pressure alert at Portsmouth M&R; inlet pressure of 250 psig.***

• **8:00 AM-9:00 AM – NG LNG vaporization rate back up to 2,475 MMBtu @ 179 psig.**

- 8:14 AM – AGT restores flow rate to pre-event conditions at Weymouth M&R. (Flow rate goes from 150,000 Dth/d to 550,000 Dth/d.)
- 8:45 AM – AGT Gas Control notifies NG regarding the issue at Weymouth M&R. NG LNG for the first time mentions NG LNG plant was having issues but provides no specific information or informs AGT of shutdown.
- 9:00 AM-10:00 AM – NG LNG plant vaporizes 1,700 MMBtu @ 177 psig.
- 9:00 AM – Inlet pressure at Portsmouth M&R at 97.7 psig, below 100 psig contractual pressure.
- 9:06 AM – NG LNG plant shuts down again.
- 9:26 AM – NG bypass regulators in Newport low pressure distribution system and other regulators.*
- 9:44 AM – NG LNG starts Compressor 1.
- 9:45 AM – **Emergency situation** - Inlet pressure at the Portsmouth M&R drops to less than 50 psig. NG's National Response Center (NRC) report #1235735 states, that NG claims the loss of natural gas supply is due to unknown reasons. Report submitted at 9:32 PM.
- 10:00 AM-11:00 AM – NG LNG vaporizes 2,800 MMBtu @194 psig.
- 10:06 AM – NG starts receiving no gas calls.
- 10:30 AM – NG begins attempt to mobilize portable LNG operation in Portsmouth RI.
- 10:30 AM – NG LNG increases LNG send out into distribution systems supplied by AGT from their other LNG facilities in Wareham and South Yarmouth, Massachusetts, to reduce demand on AGT's G-System.
- 10:30 AM – NG requests an emergency gas supply at the Mendon M&R from Tennessee Gas Pipelines ("TGP"), (a separate gas distribution company that has an interconnection with AGT in Mendon).
- 10:55 AM – AGT re-programs the meter, which resolves flow rate issue at Weymouth M&R. Normal operations resume with an outlet pressure of over 900 psig.
- 11:00 AM-12:00 PM – NG Providence LNG vaporizes 5,000 MMBtu @ 127 psig.
- 11:22 AM – Pressure at inlet of Portsmouth M&R reaches low point, 36.4 psig.
- 11:23 AM – TGP Mendon compressor station is taken offline operationally but due to the pressure difference between Mendon and AGT system, continued to flow into the AGT system. As the pressure equalized, the flow rate of 6,666 MMBtu/hr continues reducing until Flowrate was 0 at 11:53.
- 11:00 AM – NG learns they will not have glycol for the portable LNG.
- 11:06 AM – NG shuts off portion of the low-pressure system in Middletown to maintain pressure to larger system in Newport.*
- 12:00 PM – NG has received >150 no gas calls.*
- 12:00 PM-1:00 PM – NG LNG vaporizes 3,500 MMBtu @ 125 psig.
- 12:25 PM - TGP Mendon - After discussions between AGT and TGP gas control, the Mendon compressor station is brought back online and the flowrate resumes to 6,666 MMBtu/hr for the rest of the gas day.
- 1:00 PM – NG has received >370 no gas calls.*

-11-

32.     NG then attempted to mobilize and render operational a former LNG terminal in Portsmouth Rhode island by shipping supplemental LNG ,via truck to Portsmouth RI, however, due to inadequate planning, poor communication, unavailability of equipment and supplies and poor emergency response measures, NG was unable to do so in a timely manner, resulting in the shutting down of its entire Aquidneck Island natural gas transportation system. (Due to low gas pressures many of the customers had their pilot lights go out. Once gas service was restored, if the pilot light is out, free gas would disburse in the household, increasing the threat of explosion and the risk of injury or damage to its customers.)

33.     In summary, the three failures that occurred, that led to the low pressures at Portsmouth M&R and the loss of gas to customers in NG's Newport System were due to:

        (1)  the NG LNG Providence shut down  caused by the failure by NG LNG to properly investigate  and repair  a known mechanical and electrical problem at the Providence LNG facility that had previously caused a shut down of the plant.

        (2) overtakes by NG on AGT's G-system.  Specifically while working to increase revenue, NG oversold gas transmission to AGT, and

        (3) the Weymouth meter configuration error;

        (4) The result of these combined negligent failures  resulted in a breach of contract with NG's Aquidneck natural gas customers to provide gas service on the coldest gay of the winter, a concern that had been brought to light by the PUD commissioners questioning on the proposed Navy project in the fall of 2018.

        (5) As the outage unfolded, NG publicly blamed AGT, for the Weymouth M&R's meter configuration error resulting in a  valve failure, without disclosing NG's responsibilities in creating the crisis.

---

- **1:00 PM-2:00 PM – NG LNG vaporizes 3,000 MMBtu.**
- **2:00 PM – NG has received >650 no gas calls.***
- **2:00 PM-3:00 PM – NG LNG vaporizes 4,000 MMBtu.**
- **3:00 PM – NG has received >965 no gas calls.***
- **3:00 PM – Pressure on the G-System begins to increase toward normal conditions. Low-pressure system on the island remain unstable. Now more than 1200 NG calls.**
- **3:30 PM – NG plots outage calls and recognizes that they are spread across more segments of the gas system than expected and shuts down the system.**

34.    Due to the Defendants' negligence and breach of contract, Aquidneck Island businesses and residents were without gas or heat for more than a week in one of the coldest periods in recent history.

35.    Subsequent to the gas outage investigations as to the root cause of the outage were undertaken by the Rhode Island Division of Public Utilities ("PUD") and the Office of Pipeline Safety, Accident Investigation, a division of United States Department Of Transportation, Pipeline and Hazardous Materials Safety Administration."PHMSA"(See attached Ex. A)

36.    The Federal report was published on 8/13/19 and The Rhode Island PUD Report on October 30, 2019. Both Reports came to the same conclusion that multiple negligent factors by the Defendants were the cause the low pressure system on Aquidneck Island, culminating in the shutdown and the  "Newport Gas Crisis". (See attached Ex. B)

37.    The precipitating factors documented in the report were:

   i. The overtakes at the Portsmouth M&R take station. (See attached Rhode Island Public Utilities Division ("PUD") and ("PHMSA") reports attached hereto.)]

   ii. National Grid's ("NG") forced shutdown of its Liquid Natural gas ("NG LNG") vaporization facility in Providence that made its LNG unavailable to supplement the low pressure on the G-System; and

   iii. the meter programming error at Enbridge's affiliate AGT at the Weymouth MA substation ("M&R"), causing the gas regulation valve to malfunction;

## CLASS ACTION

38.    **Class Definition**

   Economic and Property Damages (E&P.D.) Class means the individuals and entities defined in this Section, subject to the Exclusions in Section 39  below. If a person or entity is included within the geographical descriptions in Section 38 (A) or Section 38 (B), and their claims meet the descriptions of one or more of the Damage Categories described in Section 38 (C) that person or entity is a member of the Economic and Property Damages Class, unless the person or entity is excluded under Section 39 (a-d):

-13-

A. **Individuals**

Unless otherwise specified, all individuals residing on Aquidneck Island who, as of January 21, 2019, were approximately 7455 customers of Narragansett Electric (NG) that lost gas who lived in, or owned or leased real or personal property located within, Aquidneck Island, Rhode Island.

B. **Entities**

All Individuals that:
(a) owned, operated, or leased a residential home on Aquidneck Island; or
(b) owned or leased real property on Aquidneck Island.

C. **Damage Categories**

Individuals who meet the descriptions of Sections 38 (A) or 38 (B) above are included in the E&P.D. Class only if their claims meet the descriptions of one or more of the Damage Categories described below:

a. Real Property Damage Category: losses suffered by owners and lessees of real property located on Aquidneck Island, including frozen and ruptured water pipes.

b. Personal Property Damage Category: losses suffered by owners and lessees of personal property located on Aquidneck Island.

c. Evacuation Damage Category: losses suffered by those who evacuated their homes or businesses pursuant to voluntary evacuations.

d. Inconvenience Damage Category: losses suffered by those inconvenienced due to the loss of gas and heat.

39.   Exclusions From the Economic and Property Damages Class Definition.

Notwithstanding the above, the following individuals and entities are excluded from the E&P.D. Class:

a. Any E&P.D. Class Member who or which timely electing exclusion under any opt-out procedure directed by the Court.

b. Defendants, and individuals who are current employees of Defendants.

-14-

c. The Court, including any sitting judges on the Superior Court of the State of Rhode Island, their law clerks serving during the pendency of this action, and members of any such judge's or current law clerk's immediate family.

d. Any companies that insure any parties or Class members against the losses alleged in this complaint.

40.    The members of the Class are so numerous that a joinder of all members would be impracticable.  Based on public information on the numbers of businesses harmed, interrupted, and persons displaced or otherwise affected, the Class of those with harm is in excess of 7,455 customers. {( See Summary Investigation Into Aquidneck Island Gas Interruption of January 2019 pp (4).}

41.    The Class is ascertainable. The Class definition identifies groups of unnamed Plaintiffs all of whom are individuals residing or owning property on Aquidneck Island in January 2019 by describing a set of common characteristics sufficient to allow a member of that group to self-identify as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the Class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications.

42.    A well-defined community of interest in questions of law or fact involving and affecting all members of the Class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members. This action is amenable to a class-wide calculation of damages, or the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the Class. The most significant questions of law and fact that will decide the Aquidneck Island litigation are questions common to the Class, or to definable categories or subclass thereof, and can be answered by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common to the Plaintiffs and Class members, include, among others, the following:

a. Whether AGT knew, or with the reasonable exercise of care, should have known of the dangerous characteristics, properties, and potentialities of valve failure, but failed to take reasonable preventive measures to avoid this catastrophe;

b. Whether the Defendants, and/or each of them, breached their respective duties owed individually and/or collectively to the class members.

c. Whether the untimely automatic shutdown of the NG LNG's Providence LNG plant and resulting failure to supply gas from NG LNG's Providence plant to AGT's G-System contributed to inadequate gas pressure at AGT's Portsmouth M&R.

d. Whether the NG LNG ESD would have been prevented if NG LNG identified the cause of prior ESDs that occurred before the January 21, 2019 shutdown.

e. Whether NG LNG's failure to communicate the problems to AGT in a timely manner resulted in an inability of AGT or other gas suppliers to assist in mitigating the consequences of NG LNG shutdown;

f. Whether NG LNG was grossly negligent in its failure to adequately investigate the automatic shutdown of the Providence LNG facility in November 2018 and resolve the problem with the electrical system at that time thereby preventing the reoccurrence on January 21, 2019, contributing to the Gas outage;

g. Whether in the pursuit of profits and increased gas sales, NG negligently and routinely exceeded their contracted gas supply on the G-System that supplied Aquidneck Island leading to an the inevitable inability of AGT to meet the exceeded demand on the G system on January21, 2021, precipitating the gas crisis.

h. Whether NG negligently balanced gas takes among the various M&Rs on the G-System where they are limited to take the amount of gas nominated to individual M&Rs.

i. Whether NG negligently failed to have a comprehensive understanding of the impact that the loss of the NG LNG Providence plant had on downstream systems, including the Portsmouth M&R, resulting in their failure to establish an LNG system in Portsmouth RI to supplement the supply of gas on cold days and in emergencies;

j. Whether negligent planning and forecast errors led NG to conclude that it did not need LNG vaporization capability to back up any low pressure emergencies;

k. Whether the failure by all Defendants to properly train and to supervise employees and agents responsible for maintenance and inspection of the natural gas lines led to the outage;

l. Whether the Defendants were negligent in their construction, maintenance, and operation of gas transmission line infrastructure, and/or other equipment;

m. Whether Defendants breached these duties to Plaintiffs and Class members;

n. Whether Defendants' actions or inactions were a substantial factor in causing harm to Plaintiffs and Class members;

o. Whether the Gas outage caused physical injury to Plaintiffs' and Class members' properties;

-16-

p. Whether the Gas outage interfered with or continue to interfere with the Plaintiffs' and Class members' comfortable enjoyment of their lives or property;

q. Whether Defendants have created a public nuisance;

r. Whether the Defendants have taken or have damaged the property, resulting in lost business profits or sales of Plaintiffs and Class members;

s. Whether Defendants have provided just compensation for having taken or having damaged the property of Plaintiffs and Class members;

t. Whether Defendants violated any Rhode Island or Federal statutes;

u. Whether class members have suffered from inconvenience due to the outage:

v. Whether AGT and NG LNG breached its tariff and other service agreements with NG thereby breaching its contracts with the plaintiffs on Aquidneck Island.

w. Whether the Defendants are strictly liable.

43.  The class structure provides the remedies and structural mechanisms to best ensure the equitable treatment of claims against the Defendants arising from the Gas Outage including the proper measure of damages and formulae of allocation to each category of Class damages and losses.

44.  Plaintiffs' claims are typical of the members of the Class. The evidence and the legal theories regarding Defendants' alleged wrongful conduct are substantially the same for Plaintiffs and all of the Class members.

45.  Plaintiffs will fairly and adequately protect the interests of the Class members.

46.  Plaintiffs have retained competent counsel experienced in class action litigation to ensure such protection. Most recently, Plaintiffs counsel participated as one of the attorneys in the Lawrence Gas Explosion case against Columbia Gas that is presently in the process of being settled for $143,000,000.00.  Plaintiffs and their counsel intend to prosecute this action vigorously.

47.  The class action provides for the fair and efficient adjudication of this case or controversy. Even if any individual persons or group(s) of Class members can afford individual litigation, individual litigation of all claims would be unduly burdensome to the courts in which the individual litigation(s) would proceed. The class action device provides the benefits of unitary and inclusive adjudication, economies of scale, and comprehensive adjudication by a single court.

-17-

48. Prosecution of separate actions by all individual Class members may create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class, lead to the under inclusive, inconsistent or otherwise inequitable allocation of Defendants' available assets and insurance among similarly situated claimants, and/or lead to repetitious trials of numerous common questions of fact and law. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class.

49. That the class is so numerous and is in excess of almost 7500 individuals affected and joinder of all members is impracticable.

## COUNT ONE

### Strict Liability - Ultra hazardous Activities - All Defendants
### (State Claim)

50. Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

51. The supplying and transportation of natural gas involve matters of public concern, represent an ultra hazardous and inherently dangerous activity rendering Defendants strictly liable.

52. At all times material hereto, Defendants owned, controlled, constructed, maintained, possessed, managed, supervised, provided and/or operated the piping infrastructure (including, but not limited to, vaporizers, compressor stations, processing plants, M&R take stations, valves (flow pressure and relief), distribution lines, transmission lines, service lines, regulators and meters) which allowed for the storage and transmission of natural gas into Aquidneck Island, Rhode Island.

53. At all times material hereto, Defendants knew or reasonably should have known that the infrastructure used to carry the natural gas into Aquidneck Island was inadequate during a cold spell and, among other things, susceptible to low gas flow and exhibited problems (or the potential for problems) with respect to gas pressurization.

54. At all times material hereto, Defendants knew or reasonably should have known that the infrastructure used to carry the natural gas into Rhode Island could not be owned, controlled, constructed, maintained, possessed, managed, supervised, provided and/or operated in a safe and reliable manner in the event of a cold snap in the region.

55.     Plaintiffs have been damaged and suffered losses by reason of the Defendants' actions and/or inactions associated with its supply and transportation or natural gas in the context of the facts alleged herein.

56.     By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered increased expenses due to displacement, and/or inconvenience and other consequential economic losses in an amount according to proof at trial.

57.     By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to real property, including loss of use, benefit, goodwill, diminution in value, and/or enjoyment of such property in an amount according to proof at trial.

58.     As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or related consequential damages in an amount according to proof at trial.

59.     The damages and losses suffered by Plaintiffs were and are the kind of damages and losses that would reasonably be expected, or should have been reasonably expected when supplying and distributing natural gas in the context of the facts as so far known.

WHEREFORE, Plaintiffs demand judgment for all damages including punitive damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## **COUNT TWO**

### **The Narragansett Electric Company d/b/a National Grid ("NG")**
### **(State Claim- Negligence)**

60.     Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

61.     The "Newport Gas Crisis" was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendant NG.

62.     Defendant NG, owed Plaintiffs a duty of reasonable care in their ownership, control, construction, maintenance, possession, management, supervision, provision, and/or operation of the supply and distribution of natural gas to Aquidneck Island, including the City of Newport and Town of Middletown.

63.     Defendant NG owed Plaintiffs the statutory duties set forth at RIGL Title 39, *et seq.* of the Rhode Island General Laws as well as those laws and regulations imposed under the tariff agreement between NG and the RI Public Utility commission.

64.     It was also the duty of the Defendant to provide natural gas products at a safe pressure.

65.     On the day of the gas outage, the lines were under pressurized. The restriction of gas resulted in the unsafe pressure which was the direct result of Defendants' failure to reasonably inspect, repair, maintain, update and monitor its gas transmission lines.

66.     The Defendant NG was negligent and breached its respective duties owed individually and/or collectively to Plaintiffs by, including but not limited to:

   a.    NG negligently failed to understand their right to balance gas takes among the various M&Rs on the G-System, resulting in an overtake of the G System on January 21,2019, precipitating the crisis.

   b.    NG failed to have a comprehensive understanding of the impact the loss of the NG LNG Providence plant had on downstream systems, including Portsmouth, resulting in their failure to establish an LNG system in Portsmouth RI to supplement the supply of gas on cold days and in emergencies.

   c.    Negligent planning and forecast errors led NG to conclude that it did not need additional capacity to Aquidneck Island and  LNG vaporization capability on Aquidneck Island to back up any low pressure emergencies.

   d.    NG's failure to properly supervise and ensure that its affiliate NG LNG to investigate, identify and resolve the cause of an unexplained automatic shutdown in November 2018 of the NG LNG plant in Providence. (the ESD that previously occurred.) (The January 21, 2019 untimely automatic shutdown of the NG LNG's Providence LNG plant and resulting failure to supply gas from NG LNG's Providence plant to AGT's G-System was one of the critical precipitating factors in the Newport Gas Crisis)

   e.    Violation of RIGL Title 39, *et seq.* of the Rhode Island General Laws for its failure to exercise due care to assure an adequate and reliable supply of natural gas to its customers.

   f.    Violation of NG's tariff with PUD to take reasonable care in providing regular and uninterrupted service to its firm customers on Aquidneck Island.

67.     By reason of the Defendants' actions and/or omissions, Plaintiffs were injured and incurred and continue to incur property and other damages.

68. By reason of Defendants' actions and/or omissions, Plaintiffs have suffered increased expenses due to displacement, inconvenience and/or other consequential and economic losses in an amount according to proof at trial.

69. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to real property, including a diminution in value and a loss of use, benefit, goodwill, and/or enjoyment of such property, in an amount according to proof at trial.

70. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to and/or loss of personal property, in an amount according to proof at trial.

71. As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendant together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT THREE

### The Narragansett Electric Company d/b/a National Grid
### (State Claim- Public Nuisance)

72. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

73. Defendant NG owed a non-transferable, non-delegable duty to the public, including Plaintiffs and Class members, to conduct their business, in particular the maintenance, operation, ownership, control, construction, maintenance, possession, management and supervision, operated the natural gas supply and/or infrastructure (including, but not limited to, processing plants, city gates, valves (flow, pressure control, relief), distribution lines, transmission lines, service lines, regulators and meters) (collectively for this Count, "Infrastructure"), to supply and distribute natural gas to Aquidneck Island, through their gas transmission lines, substations, and M&Rs, in a manner that did not threaten harm or injury to the public welfare.

74. Defendants, by acting and/or failing to act, as alleged herein above, created a condition that was harmful to the health of the public, including Plaintiffs and Class members, and created a loss of gas and  fire and explosion hazard and other potentially dangerous conditions to Plaintiffs' and the Class' property, which interfered with the comfortable occupancy, use,

and/or enjoyment of Plaintiffs' and the Class' property. This interference is both substantial and unreasonable.

75.     Plaintiffs and Class members did not consent, expressly or impliedly, to the wrongful conduct of the Defendants.

76.     The hazardous condition which was created by and/or permitted to exist by Defendants affected a substantial number of people at the same time within the general public, including Plaintiffs and Class members, and constituted a public nuisance.

77.     As a direct and legal result of the conduct of Defendants, Plaintiffs and Class members suffered harm.  Specifically, Plaintiffs and Class members lost the occupancy, possession, use, and/or enjoyment of their land, real, and/or personal property, including, but not limited to; a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of their property; an impairment of the ability to sell their property.

78.     As a further direct and legal result of the conduct of Defendants, Plaintiffs and Class members have suffered, and will continue to suffer, inconvenience, discomfort, anxiety, fear, worries, annoyance, and/or stress attendant to the interference with Plaintiffs' occupancy, possession, use and/or enjoyment of their property.

79.     A reasonable, ordinary person would be annoyed or disturbed by the condition created by Defendants, and the Gas outage.

80.     Defendants' conduct is unreasonable and the seriousness of the harm to the public, including Plaintiffs and Class members, outweighs the social utility of Defendants' conduct. There is little or no social utility associated with causing a gas outage affecting in excess of 7,500 customers on one of the coldest days of the year for, in many cases, several weeks.

81.     The unreasonable conduct of Defendants is a direct and legal cause of the harm, injury, and/or damage to the public, including Plaintiffs and Class members.

82.     Defendants have individually and/or collectively failed to and refused to conduct proper inspections and to properly inspect and repair its equipment and LNG facilities in order to ensure the safe delivery of gas to residents and businesses through the operation of gas transmission lines in the affected area, and Defendants' individual and/or collective failure to do so exposed every member of the public to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

83.     Defendants' conduct set forth above constitutes a public nuisance and Plaintiffs have standing to maintain an action for public nuisance because the nuisance is especially injurious to Plaintiffs and Class members because, as described above, it is injurious and/or offensive to the senses of Plaintiffs, unreasonably interferes with the comfortable enjoyment

of their properties, and/or unlawfully obstructs the free use, in the customary manner, of their properties.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, including interest, costs and attorneys fees, as well as an order enjoining the Defendants from operating the Infrastructure, gas transmission lines and equipment in an unsafe and harmful way and requiring the Defendants analyze, identify and correct deficiencies as well as implement processes and procedures.

## COUNT FOUR

### National Grid LNG- (NG LNG)
### State claim - Negligence

84.    That jurisdiction is based on the language of the NG-LNG tariff, the company's Service Agreements with NG and its agreement with PUD to share in the regulation of the NG LNG facility in Providence.

85.    The Defendants knew, or with the reasonable exercise of care, should have known of the dangerous characteristics, properties, and potentialities of valve failure gas lines but failed to take reasonable preventive measures to avoid this catastrophe.

86.    The Defendant NG LNG, was negligent and breached its respective duty of care owed individually and/or collectively to Plaintiffs by, including but not limited to:

   a.    Violation of RIGL Title 39, *et seq.* of the Rhode Island General Laws for its failure to exercise due care to maintain and operate its facility.

   b.    The failure of NG LNG to investigate, identify and resolve the cause of the previous unexplained automatic shutdown in November 2018 of the NG LNG plant. That failure resulted in a repeat of the automatic shutdown of NG LNG's plant on January 21st, resulting in its failure to supply gas to NG to supply Aquidneck Island which was one of the critical precipitating factors in the Newport Gas Crisis.

   c.    NG LNG did not communicate the shutdown problems to AGT in a timely manner resulting in an inability of AGT or other gas suppliers to assist in mitigating the consequences of NG LNG shutdown.

   d.    LNG NG knew or should have known that it affiliate NG on the G-System relied on supply from NG LNG when their gas usage significantly exceeded their nominations during the coldest and most operationally sensitive part of the day. Historically, there were multiple occurrences when usage exceeded nominations on the G-System.

-23-

Case 1:19-cv-00643-JJM-LDA   Document 12-13   Filed 01/13/20   Page 24 of 33 PageID #: 358

e.   NG LNG negligently failed to understand the obligation of its affiliate NG to balance gas distribution among the ten (10) M&Rs on the G-System, resulting in a pressure drop at the Portsmouth M&R on January 21,2019, precipitating the crisis.

f.   NG LNG failed to have a comprehensive understanding of the impact the loss of its Providence plant had on downstream systems, including Portsmouth, resulting in its failure to establish an LNG system in Portsmouth RI to supplement the supply of gas on cold days and in emergencies.

g.   Negligent planning and forecast errors led NG LNG to conclude that it did not need NG LNG vaporization capability on Aquidneck Island to back up any low pressure emergencies.

h.   NG LNG failed to properly train and to supervise employees and agents responsible for maintenance and inspection of its LNG facility;

87.   By reason of the Defendants' actions and/or omissions, Plaintiffs were injured and incurred and continue to incur damages.

88.   By reason of Defendants' actions and/or omissions, Plaintiffs have suffered increased expenses due to displacement, inconvenience and/or other consequential and economic losses in an amount according to proof at trial.

89.   By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to real property, including a diminution in value and a loss of use, benefit, goodwill, and/or enjoyment of such property, in an amount according to proof at trial.

90.   By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to and/or loss of personal property, in an amount according to proof at trial.

91.   As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT FIVE

### National Grid LNG- (NG LNG)
### Gross Negligence- Federal claim

92.  LNG NG knew or should have known that it affiliate NG on the G-System relied on supply from NG LNG when their gas usage significantly exceeded their nominations during the coldest and most operationally sensitive part of the day.

93.  Historically, there were multiple occurrences when usage exceeded nominations on the G-System. NG LNG had a duty to operate and manage its LNG facility in a safe manner and provide natural gas products under the laws and regulations imposed under the guidelines promulgated by the Department of Transportation, codified in the Pipeline and Hazardous Materials Safety Administration "PHMSA" to NG and others.

94.  The Defendant NG LNG, was grossly negligent and breached its respective duties owed individually and/or collectively to Plaintiffs by, including but not limited to:

   a.  The failure of NG LNG to investigate, identify and resolve the cause of the unexplained automatic shutdown in November 2018 of the NG LNG plant in Providence. (the ESD that previously occurred).The failure to do so resulted in the January 21, 2019 untimely automatic shutdown of the NG LNG's Providence LNG plant resulting in the dangerous failure to timely vaporize LNG to supply natural gas from NG LNG's Providence plant to Aquidneck Island, one of the critical precipitating factors in the Newport Gas Crisis.

   b.  Failure to communicate the shutdown problems to AGT in a timely manner resulting in an inability of AGT or other gas suppliers to assist in mitigating the consequences of NG LNG shutdown.

   c.  Failure to understand the right of its affiliate NG to balance gas distribution among the ten (10) M&Rs on the G-System, resulting in a pressure drop at the Portsmouth M&R on January 21,2019, precipitating the crisis.

   d.  Failure to have a comprehensive understanding of the impact the loss of its Providence plant had on downstream systems, including Portsmouth, resulting in its failure to establish an LNG system in Portsmouth RI to supplement the supply of gas on cold days and in emergencies.

   e.  Failure to plan and forecast errors led NG LNG to conclude that it did not need LNG vaporization capability on Aquidneck Island to back up any low pressure emergencies.

95.  By reason of the Defendants' actions and/or omissions, Plaintiffs were injured and incurred and continue to incur damages.

96. By reason of Defendants' actions and/or omissions, Plaintiffs have suffered increased expenses due to displacement, inconvenience and/or other consequential and economic losses in an amount according to proof at trial.

97. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to real property, including a diminution in value and a loss of use, benefit, goodwill, and/or enjoyment of such property, in an amount according to proof at trial.

98. By reason of the Defendants' actions and/or omissions, Plaintiffs have suffered damage to and/or loss of personal property, in an amount according to proof at trial.

99. As a further direct and legal result of the Defendants' actions and/or omissions, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs demand judgment for all damages including punitive damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT SIX

### National Grid LNG- (NG LNG)
### Breach of Contract -Third Party Beneficiary
### (State Claim)

100. NG and NG LNG as affiliates had operating and other agreements in which NG LNG agreed and had a duty of care to store and redeliver gas to NG.

101. That in a number of significant respects NG LNG failed to manage its LNG storage system with due care and these failings proximately caused NG LNG to breach its gas sales agreement with NG; specifically the negligent failure of NG LNG to investigate, identify and resolve the cause of the previous unexplained automatic shutdown in November 2018 of the NG LNG plant resulted in the subject untimely automatic shutdown of NG LNG's LNG resulting in its failure to supply gas to NG to supply Aquidneck Island which was one of the critical precipitating factors in the Newport Gas Crisis.

102. That the plaintiffs as intended beneficiaries are third party beneficiaries of that contract. (An intended beneficiary of a contract "stands in the shoes" of the promisee. Cathay, Inc., 962 A.2d at 746 (quoting Campione v. Wilson, 661 N.E.2d 658, 664 (Mass. 1996)).

103. It is well settled that "[w]hen one party for valuable consideration, engages another by contract to do some act for the benefit of a third party, the latter who would enjoy the benefits, may maintain an action for breach of contract." Davis v. New England Pest Control Co., 576 A.2d 1240, 1242 (R.I. 1990); see also Cathay Inc. v. Vindalu, LLC, 962 A.2d 740, 745-46 (R.I. 2009)

104. That as a result of the Defendants breach of contract the Plaintiffs incurred and continue to incur property damage, a diminution in value and a loss of use, benefit, goodwill, and/or enjoyment of such property, increased expenses due to displacement, inconvenience and/or other consequential and economic losses in an amount according to proof at trial.

105. As a further direct and legal result of the Defendants' breach of contract, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT SEVEN

### Negligence: Algonquin Gas Transmission llc (AGT)
### (State Claim)

106. Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

107. The Newport Gas Crisis was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendant AGT.

108. The Defendants, including AGT and/or each of them, owed Plaintiffs a duty of reasonable care in their ownership, control, construction, maintenance, possession, management, supervision, provision, and/or operation of the supply and distribution of natural gas to Aquidneck Island.

109. The Defendants, and/or each of them, owed Plaintiffs the statutory duties set forth at Title 39, *et seq.* of the Rhode Island General Laws as well as those laws and regulations imposed under the guidelines promulgated by the US Department of Transportation, codified in the Pipeline and Hazardous Materials Safety Administration ("PHMSA").

110.   It was also the duty of the Defendant corporations to provide natural gas products at a safe pressure.  Defendants were well aware of the devastation that could result from under pressurized gas lines.

111.   Algonquin's Gas Transmission system, like most large gas transmission systems, has flexibility as to how it can be operated while meeting contractual pressure and flow obligations and daily/hourly gas nominations with NG. When operating near operational capacity, the flexibility of the system becomes limited and sensitive to operational upsets or to gas usage exceeding forecasted or nominated volumes.

112.   On January 31, 2017 NG exceeded the forecasted and contracted flow and volume of gas usage with AGT, at the Portsmouth M&R requiring an increase of flow from Enbridge/Algonquin.

113.   In attempting to increase the flow of gas to Portsmouth RI, AGT /Algonquin attempted to activate and open a valve at its' Weymouth M&R.  However, due to operator error and negligence in the programming of the ultrasonic meters that controlled the valve that regulated the flow of gas from the Weymouth M&R to the Portsmouth M&R, the meter caused the valve to close rather than open, further exacerbating the low-pressure at the Portsmouth M&R.

114.   The error in programming was due to the failure of operational readiness, contingency planning, system enhancements, and enhanced communication by the Defendant.

115.   The operational error was preventable and said failure was further exacerbated by the negligent failure to mitigate the error once it had been discovered due to the failure of operational readiness, contingency planning, system enhancements and enhanced communication among its employees and the other Defendants.

116.   The Defendants knew that the 4 mile - 6" pipeline at the tail end of Enbridge's G-System that feeds the Portsmouth M&R is the most vulnerable location on the G-System to a large pressure drop and failed to take contingency actions to alleviate the dangerous system.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

## COUNT EIGHT

### Gross Negligence: Algonquin Gas Transmission llc (AGT)
### (Federal Claim)

117.  Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

118.  The Newport Gas Crisis was a direct and legal result of the negligence, carelessness, recklessness, and/or unlawfulness of Defendant AGT.

119.  The Defendants, including AGT and/or each of them, owed Plaintiffs a duty of reasonable care in their ownership, control, construction, maintenance, possession, management, supervision, provision, and/or operation of the supply and distribution of natural gas to Aquidneck Island.

120.  The Defendants, and/or each of them, owed Plaintiffs the statutory duties set forth in those laws and regulations imposed under the guidelines promulgated by the US Department of Transportation, codified in the Pipeline and Hazardous Materials Safety Administration ("PHMSA").

121.  It was also the duty of the Defendant corporations to provide natural gas products at a safe pressure. Defendants were well aware of the devastation that could result from under pressurized gas lines.

122.  Algonquin's Gas Transmission system, like most large gas transmission systems, has flexibility as to how it can be operated while meeting contractual pressure and flow obligations and daily/hourly gas nominations with NG. When operating near operational capacity, the flexibility of the system becomes limited and sensitive to operational upsets or to gas usage exceeding forecasted or nominated volumes.

123.  On January 31, 2017 NG exceeded the forecasted and contracted flow and volume of gas usage with AGT, at the Portsmouth M&R requiring an increase of flow from Enbridge/Algonquin.

124.  In attempting to increase the flow of gas to Portsmouth RI, AGT /Algonquin attempted to activate and open a valve at its' Weymouth M&R. However, due to operator error and negligence in the programming of the ultrasonic meters that controlled the valve that regulated the flow of gas from the Weymouth M&R to the Portsmouth M&R, the meter caused the valve to close rather than open, further exacerbating the low-pressure at the Portsmouth M&R.

125.  The error in programming was due to the failure of operational readiness, contingency planning, system enhancements, and enhanced communication by the Defendant.

126.  The operational error was preventable and said failure was further exacerbated by the negligent failure to mitigate the error once it had been discovered due to the failure of operational readiness, contingency planning, system enhancements and enhanced communication among its employees and the other Defendants.

127.  The Defendants knew that the 4 mile - 6" pipeline at the tail end of Enbridge's G-System that feeds the Portsmouth M&R is the most vulnerable location on the G-System to a large pressure drop and failed to take contingency actions to alleviate the dangerous system.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law including punitive damages against Defendants, jointly and severally, together with interest and costs and attorneys fees  in a sum sufficient to confer jurisdiction upon this Court.

## COUNT NINE

### Breach of contract:  Algonquin Gas Transmission llc (AGT)
### (State Claim)

128.  Plaintiffs reassert and re-allege all of the preceding paragraphs as if set forth herein in full.

129.  AGT  had operating and other agreements and a tariff  in which AGT  agreed and had a duty of care to deliver gas to NG.

130.  In attempting to increase the flow of gas to Portsmouth RI, AGT /Algonquin attempted to activate and open a valve at its' Weymouth M&R.  However, due to operator error and negligence in the programming of the ultrasonic meters that controlled the valve that regulated the flow of gas from the Weymouth M&R to the Portsmouth M&R, the meter caused the valve to close rather than open, further exacerbating the low-pressure at the Portsmouth M&R.

131.  The error in programming was due to the failure of operational readiness, contingency planning, system enhancements, and enhanced communication by the Defendant.

132.  The operational error was preventable and said failure was further exacerbated by the negligent failure to mitigate the error once it had been discovered due to the failure of operational readiness, contingency planning, system enhancements and enhanced communication among its employees and the other Defendants.

133.  The Defendants knew that the 4 mile - 6" pipeline at the tail end of Enbridge's G-System that feeds the Portsmouth M&R is the most vulnerable location on the G-System to a large pressure drop and failed to take contingency actions to alleviate the dangerous system.

134. As alleged above, AGT failed to manage its M&R in Weymouth Massachusetts with due care and these failings proximately caused AGT to breach its  gas sales agreement with NG resulting in its failure to supply gas to Aquidneck Island which was one of the critical precipitating factors in the Newport Gas Crisis.

135. That the plaintiffs  as intended beneficiaries are third party beneficiaries of that contract. (An intended beneficiary of a contract "stands in the shoes" of the promisee. Cathay, Inc., 962 A.2d at 746 (quoting Campione v. Wilson, 661 N.E.2d 658, 664 (Mass. 1996)).

136. It is well settled that "[w]hen one party for valuable consideration, engages another by contract to do some act for the benefit of a third party, the latter who would enjoy the benefits, may maintain an action for breach of contract." Davis v. New England Pest Control Co., 576 A.2d 1240, 1242 (R.I. 1990); see also Cathay Inc. v. Vindalu, LLC, 962 A.2d 740, 745-46 (R.I. 2009)

137. That as a result of the Defendants breach of contract the Plaintiffs incurred and continue to incur property damage, a diminution in value and a loss of use, benefit, goodwill, and/or enjoyment of such property, increased expenses  due to displacement, inconvenience and/or other consequential and economic losses in an amount according to proof at trial.

138. As a further direct and legal result of the Defendants' breach of contract, Plaintiffs have incurred and will continue to incur expenses and other economic damages related to the damage to their property, including costs relating to storage, clean-up, disposal, repair, depreciation, and/or replacement of their property, and/or other related consequential damages in an amount according to proof at trial.

WHEREFORE, Plaintiffs demand judgment for all damages recoverable under the law against Defendants, jointly and severally, together with interest and costs and attorneys fees in a sum sufficient to confer jurisdiction upon this Court.

### PRAYERS FOR RELIEF

139. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

A. For these reasons, Plaintiffs also seek a permanent injunction ordering that Defendants stop continue to abate the existing and continuing nuisance described above, including the following:

B. Plaintiffs also seek an order directing Defendants;

(1) Comply with all state statutes, PUD, FERC and PHMSA requirements or orders regarding Improvements in Gas Long-Range Planning: Specifically,

-31-

Prior to January 21, 2019, the PUD had identified problems with the way that NG performs its long-range capacity planning including forecasting deficiencies.

(2)   Comply with all PUD, FERC and PHMSA requirements or orders for winter Deployment of LNG Facilities on Aquidneck Island: Considering the event of January 21 and PUD' scrutiny, plaintiffs request that the NG comply with any PUD orders to deploy temporary LNG facilities on Aquidneck Island each winter to address the need to have capacity that meets hourly peaks, including on the gas design days that have the greatest demand for gas.

(3)   Comply with all PUD, FERC and PHMSA requirements or orders regarding the Evaluation of Reinforcing the Lateral Serving the Portsmouth M&R take Station including the feasibility of reinforcing service into Portsmouth by having Algonquin add a twelve-inch pipe in parallel with the existing six-inch pipe.

(4)   Comply with all PUD, FERC and PHMSA requirements or orders regarding the implementation of Demand Response Initiatives on Aquidneck Island: In addition to reinforcing the system, Narragansett Electric should comply with any by PUD to implement a demand response program designed to reduce peak hourly demand at the Portsmouth take station.

(5)   Comply with all PUD, FERC and PHMSA requirements or orders regarding Contingency Scenario System Modeling and Emergency Response Planning: Given the vulnerability of Aquidneck Island to gas low-pressure conditions, NG should be ordered comply with all PUD orders to implement a scenario-based contingency planning process.

(6)   Comply with all PUD, FERC and PHMSA requirements or orders regarding Evaluation of the Feasibility of Establishing Sectionalizing Districts in Newport: The low-pressure distribution system in Newport was not capable of being sectionalized to isolate problems on the system. NG should be ordered to comply with any orders by PUD to conduct a thorough study of this issue to evaluate the feasibility of establishing sectionalizing districts for Aquidneck Island and other potential low-pressure risk areas across Rhode Island.

(7)   That any costs incurred by the Defendants as a result of the outage be absorbed by the Defendants and not passed down to the Rate payers.

(8)   Comply with all state statutes, PUD, FERC and PHMSA requirements or orders regarding the proper maintenance and repair of the AGT meter station in Weymouth and the NG LNG plant.

-32-

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES**

Plaintiffs,
By their Attorneys,
**BRIAN CUNHA & ASSOCIATES, P.C.**

/s/ Brian R. Cunha

Brian R. Cunha, Esq.
311 Pine Street
Fall River, MA 02720
Tel: (508) 675-9500
Fax: (508) 679-6360
R.I.#4074

Dated:          January 7, 2020